## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

| | | |
|---|---|---|
| SERDAR TATAR, | : | |
| | : | |
| Petitioner, | : | Civ. No. 13-3317 (RBK) |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | **OPINION** |
| | : | |
| Respondent. | : | |

---

**ROBERT B. KUGLER, U.S.D.J.**

## I.      INTRODUCTION

Petitioner, Serdar Tatar, seeks relief *pro se* under 28 U.S.C. § 2255 from his federal

conviction and sentence. Mr. Tatar was convicted after a jury trial (along with his coconspirators

Dritan Duka, Shain Duka, Eljvir Duka (collectively the "Duka brothers") and Mohamed

Shnewer) of conspiracy to murder members of the United States military. He is currently serving

a sentence of 396 months imprisonment. Mr. Tatar raises several ineffective assistance of

counsel claims in his § 2255 motion; specifically:  (1) failure to object to the jury charge when it

reduced the burden of proof ("Claim I"); (2) failure to seek dismissal of Count 1 of the

indictment (conspiracy to murder members of the United States military) ("Claim II"); (3) failure

to object to a constructive amendment to the indictment ("Claim III"); (4) failure to allow him to

testify and obstructing his right to present a defense ("Claim IV"); (5) failure of appellate

counsel to raise Claims II and II on appeal ("Claim V"); and (6) failure of trial counsel to seek

post-verdict to dismiss the remaining conspiracy offense in count one due to retroactive

misjoinder and failure of appellate counsel to raise issue of retroactive misjoinder on appeal

("Claim VI"). Additionally, Mr. Tatar claims that sentencing enhancements found through

judicial fact-finding were improperly used to increase his sentence ("Claim VII"). The government has filed an opposition that all of the claims should be denied on the merits. For the following reasons, the Court will deny relief on all of the claims Mr. Tatar raises in his amended § 2255 motion.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Shnewer, the Duka brothers, and Tatar are a group of young men who lived in New Jersey and developed an interest in violent jihad, particularly attacks against the United States military. Defendants, who had known each other since high school, came to the FBI's attention after it received a copy of a video that was brought to a Circuit City store in Mt. Laurel, New Jersey for copying. The video dated from January 2006 and depicted the five defendants and others at a firing range in the Pocono Mountains, shooting weapons and shouting "Allah Akbar!" and "jihad in the States."

Over the course of the next sixteen months, the FBI deployed two cooperating witnesses, Mahmoud Omar and Besnik Bakalli, to monitor defendants' activities. The evidence presented at trial showed that, between January 2006 and May 2007, defendants viewed and shared videos of violent jihadist activities, including beheadings, around the world; they viewed and shared videos of lectures advocating violent jihad against non-Muslims; they sought to acquire numerous weapons, including automatic firearms and rocket-propelled grenades; they returned to the Poconos, where they again engaged in shooting practice; they discussed plans to attack the United States military; they conducted research and surveillance on various potential targets for such an attack in New Jersey, Pennsylvania, and Delaware; and they procured a map of the United States Army Base at Fort Dix to use in planning and coordinating such an attack.

With respect to the individual defendants, the evidence demonstrated the following:

Mohamad Shnewer is a naturalized American citizen who was born in Jordan. He admired and sought to emulate the "nineteen brothers," i.e., the September 11 hijackers, Osama bin Laden, and the leader of Al Qaeda in Iraq, Abu Musab al-Zarqawi. Shnewer openly discussed and planned attacks on military targets in New Jersey, Pennsylvania, and Delaware. Along with Omar, the government informant, he staked out the United States Army Base

2

at Fort Dix, McGuire Air Force Base, Lakehurst Naval Air Station, and the United States Army Base at Fort Monmouth in New Jersey; the United States Coast Guard Base in Philadelphia, Pennsylvania; and Dover Air Force Base in Delaware. Shnewer also considered attacking the federal government building at 6th and Arch Streets in Philadelphia and drove by the building to determine whether such an attack would be feasible. To accomplish an attack on these targets, Shnewer proposed deploying a gas tanker truck as a bomb, using roadside bombs or surface-to-air missiles, and spraying military targets with machinegun fire. He sought to acquire AK-47 machineguns from Omar to use in such an attack.

Dritan, Shain, and Eljvir Duka are brothers who were born in Albania. During the events that were the subject of the trial, they were in the United States illegally. In 2006 and 2007, the Dukas took at least two trips to the Poconos to train for jihad by firing weapons, attempting to buy automatic weapons, discussing jihad, and watching violent jihadist videos. The Dukas befriended government informant Bakalli, a fellow Albanian, and encouraged him to join them in avenging Muslims who had been oppressed in the United States and Israel. They viewed and praised a lecture, *Constants on the Path to Jihad*, by Anwar al-Awlaki, the prominent cleric and proponent of attacks against the United States military, and videos depicting attacks on American soldiers by violent jihadists in Iraq and elsewhere. In recorded conversations presented at trial, the Dukas described beheadings depicted in the videos as just punishment for traitors. The Dukas watched the beheading videos over and over again until they became inured to the spectacle.  Dritan told Bakalli that, although at first he "couldn't take it," "[n]ow I see it and it's nothing, I do not care. I saw hundreds being beheaded."  Similarly, Eljvir told Bakalli that the beheadings were difficult to watch at first, but that "[n]ow we can watch it no problem."

Like Shnewer, the Dukas sought to acquire firearms to further their plans. They could not acquire weapons lawfully because they were in the country illegally, so they turned to the black market. By January 2007, the three brothers told Bakalli they had acquired a shotgun, two semi-automatic rifles, and a pistol, and they continued to look for opportunities to buy machineguns.

Later that spring, Dritan Duka ordered nine fully automatic weapons – AK 47s and M-16s – from a contact of Omar in Baltimore. The FBI arranged a controlled transaction, and, on May 7, 2007, Dritan and Shain Duka went to Omar's apartment to

retrieve their weapons. After handing Omar $1,400 in cash, Dritan and Shain examined and handled four fully automatic machineguns and three semiautomatic assault rifles. They asked Omar for garbage bags to conceal the weapons (so they would look like golf clubs) as they carried them out to the car. Before they could get there, however, federal and state law enforcement officers entered Omar's apartment and arrested them. The entire transaction was captured on video by equipment installed in Omar's apartment by the FBI and was shown to the jury at trial.

Serdar Tatar is a lawful permanent resident in the United States who was born in Turkey. Tatar appears in the video of defendants' January 2006 training trip to the Poconos. After extensive discussions with Omar about Shnewer's plan to attack Fort Dix, Tatar agreed to help by providing Omar with a map of Fort Dix to use in planning such an attack. Regarding the overall plan to attack Fort Dix, Tatar told Omar in a recorded conversation, "I'm in, honestly, I'm in."

All five defendants were arrested on May 7, 2007, after Dritan and Shain Duka completed the controlled firearm purchase from Omar.

*United States v. Duka*, 671 F.3d 329, 333-35 (3d Cir. 2011).

Relevant to this Opinion, Mr. Tatar was charged with one count of conspiracy to murder members of the United States military in violation of 18 U.S.C. § 1117 ("Count 1") and one count of attempt to murder members of the United States military ("Count 2").[1] Mr. Tatar (along with the Duka brothers and Shnewer) was found guilty of Count 1 of conspiracy to kill United States military personnel. However, Mr. Tatar (along with the Duka brothers and Shnewer) were found not guilty of Count 2 of attempting to kill United States military personnel. Mr. Tatar was sentenced to 396 months imprisonment (the Duka brothers and Shnewer received life sentences).

---

[1] The Duka brothers and Shnewer were also charged in Count 1 and 2. Additionally, the superceding indictment charged the Duka brothers with possession and attempted possession of firearms in furtherance of a crime of violence ("Count 3") and possession of firearms by an illegal alien ("Count 7"). Shain and Dritan Duka were also charged with possession of machine guns ("Count 5") and possession of firearms by an illegal alien ('Count 6"). Shnewer was separately charged with one count of attempted possession of firearms in furtherance of a crime of violence ("Count 4").

The United States Court of Appeals for the Third Circuit affirmed the judgment of conviction as to Mr. Tatar. *See Duka*, 671 F.3d 329.

Mr. Tatar filed a *pro se* amended § 2255 motion raising the claims outlined in *supra* Part I. The government has filed a response in opposition and Mr. Tatar has filed a reply in support of his amended § 2255 motion.

## III.    LEGAL STANDARD FOR § 2255 MOTION

A motion to vacate, set aside or correct a sentence of a person in federal custody pursuant to 28 U.S.C. § 2255 entitles a prisoner to relief if "the court finds ... [t]here has been such a denial or infringement of the constitutional rights of the prisoner as to render judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). "In considering a motion to vacate a defendant's sentence, 'the court must accept the truth of the movant's factual allegations unless they are clearly frivolous based on the existing record.'" *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005) (quoting *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989)) (citing R. Governing § 2255 Cases R. 4(b)). A District Court "is required to hold an evidentiary hearing 'unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.'" *Id.* (quoting *Forte*, 865 F.2d at 62). The Third Circuit has stated that this standard creates a "'reasonably low threshold for habeas petitioners to meet.'" *Id.* (quoting *United States v. McCoy*, 410 F.3d 124, 134 (3d Cir. 2005) (quoting *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001))). Accordingly, this Court abuses its discretion "if it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief." *Id.* (citing *McCoy*, 410 F.3d at 134).

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD

With the exception of Claim VII, all of Mr. Tatar's claims involve whether counsel was ineffective at trial and/or on appeal. The Sixth Amendment guarantees effective assistance of counsel. In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective. First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett,* 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim in light of all of the circumstances) (citation omitted). A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland,* 466 U.S. at 690. Under this first prong of the *Strickland* test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax,* 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland,* 466 U.S. at 690–91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn,* 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland,* 466 U.S. at 690–91).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 111–12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed.'" *Rainey v. Varner,* 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland,* 466 U.S. at 697). Additionally, "claims of ineffective assistance of appellate counsel are also governed by the *Strickland* standard." *Lusick v. Palakovich,* 270 F. App'x 108, 110 (3d Cir. 2008) (citing *United States v. Mannino,* 212 F.3d 835, 840 (3d Cir. 2000)).

## V.      DISCUSSION

A.  Claim I – Failure to Object to Jury Charge that Reduced Burden of Proof

Mr. Tatar first claims that his trial counsel, Richard Sparaco, Esq., was ineffective when he failed to object to the jury charge that effectively reduced the government's burden of proof. As explained by Mr. Tatar in his amended § 2255 motion:

> [T]he trial judge committed unconstitutional legal error through his jury instructions when he removed from the jury's consideration the element of murder as the object or goal of conspiracy to murder military officials, and again, when the judge removed murder from consideration in relation to the substantive crime charged in relation to the conspiracy, i.e., the statutory offense of attempted murder of military officials under 18 U.S.C. § 1114 . . . . [¶] Here, the court's instruction encourages the jury to, somehow, only make a determination as to the element of agreement without any consideration as to what conspirator's agreed to.

(Dkt. No. 27 at p. 30)

This Court instructed the jury as follows with respect to the conspiracy charge in Count 1:

> It is a federal crime for two or more persons to agree or conspire to commit any offense against the United States even if they never actually achieve their objective. A conspiracy is a kind of criminal partnership. In order for you to find any of the defendants guilty of conspiracy to commit murder of members of the uniformed services of the United States, you must find the government proved beyond a reasonable doubt each of the following three elements:
>
> First. *That two or more persons agreed to murder members of the uniformed services of the United States, as charged in the indictment. And I will explain the elements of murder of members of the uniformed services of the United States shortly.*
>
> Second. That the defendant you are considering knowingly and willfully joined the agreement or conspiracy knowing of its objective to murder members of the uniformed services of the United States.
>
> And third. That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

(Trial. Tr. at p. 6301-02 (emphasis added)) This Court later instructed the jury as follows:

> As I stated earlier, the object or goal of the alleged conspiracy was the crime of murder of members of the uniformed services of the United States. Because the defendants are not charged with murder, and indeed because no murder was committed, the Government does not, of course, have to prove that the defendants

8

committed any such murder. Nevertheless, in order for you to properly consider the charge of conspiracy to murder members of the United States uniformed service, I must instruct you about the elements of that crime. *The government is not required to prove these elements in this case, but the government is required to prove that each of the defendants entered into an agreement to commit that crime.*

The crime of murder of members of the United States uniformed services has four elements.

One, the defendant unlawfully caused the death of one or more members of the uniformed services of the United States.

Two, the defendant did so with malice aforethought and not in the heat of passion.

Three, the killing or killings were premeditated[.]

And, Four, the victim or victims were killed while engaged in his/her official duties or in account of the performance of his/her official duties as a member of the uniformed armed services of the United States.

The defendant does not have to know that the victim was a member of the uniformed services of the United States.

As used in the instructions, the term malice aforethought means either to kill another person deliberately and intentionally or to act with callous and wanton disregard for human life.

As used in these instructions the word premeditation means the planning or deliberation. The passage of time is a factor which you may consider in attempting to determine if a defendant acted with premeditation. The amount of time either needed for premeditation of a killing depend on the person and the circumstances. The time must be long enough after forming the intent to kill, however, for the killer to be fully conscious of the intent and to have considered the killing.

(Trial Tr. at p. 6315-17 (emphasis added))

Counsel is not ineffective for not raising a meritless issue with respect to the jury instructions. *See Real v. Shannon*, 600 F.3d 302, 309-10 (3d Cir. 2010). As the above

instructions make clear, this Court instructed the jury that it could only convict Mr. Tatar of conspiracy to murder members of the United States military if it found that there was an agreement to commit the murder. Thus, contrary to Mr. Tatar's assertions, this Court did not remove from the jury's consideration that the object or goal of the conspiracy was to murder United States military members.

Mr. Tatar also argues in Claim I that "murder must be found by the jury, and cannot be separated from conspiracy in this case." (Dkt. No. 27 at p. 31) However, as the government notes in its brief, Mr. Tatar was not charged with murdering members of the United States military. Instead, Mr. Tatar was charged (and ultimately convicted of) with violating the conspiracy statute pursuant to 18 U.S.C. § 1117 in Count 1 which states as follows: "[I]f two or more persons *conspire* to violate section 1111, 1114, 1116, or 1119 of this title, and one or more such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life."[2] 18 U.S.C. § 1117 (emphasis added).

_____

[2] 18 U.S.C. § 1114 states as follows:

> Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or an account of that assistance, shall be punished –
> (1) in the case of murder as provided under section 1111;
> (2) in the case of manslaughter, as provided under section 1112; or
> (3) in the case of attempted murder or manslaughter, as provided in section 1113.

18 U.S.C. § 1114. Section 1111(a) states as follows:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to

As the United States Court of Appeals for the Third Circuit has noted:

> "Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes." *Iannelli v. United States,* 420 U.S. 770, 777, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975). "Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *Id.* "Because an agreement between two or more persons to commit criminal acts poses, in and of itself, a serious danger to social order, it is proscribed by the law of conspiracy." [*United States v.*] *Jannotti,* 673 F.2d [578,] 591 [(3d Cir. 1982)]. The goal of the conspiracy . . . need not be achieved for a conspiracy conviction. "The ultimate failure of the conspiracy may diminish, but does not eliminate, the threat it poses to social order; therefore, the illegality of the agreement does not depend on the achievement of its ends." *Id.*

*United States v. Salahuddin*, 765 F.3d 329, 341 (3d Cir. 2014), *cert. denied*, 135 S. Ct. 2309 (2015). The fact that Mr. Tatar (along with his coconspirators) were not successful in ultimately murdering members of the United States military did not reduce the burden of proof on the government since the government was not required to prove that Mr. Tatar was successful in the aims of the conspiracy. Therefore, his trial counsel was also not ineffective for failing to raise this as an issue with respect to this Court's jury instructions because the issue Mr. Tatar wanted trial counsel to raise lacks merit. *See Real*, 600 F.3d at 309-10.  Accordingly, Mr. Tatar is not entitled to relief on Claim I.

---

> perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery, or perpetrated as part of a pattern or practice of assault or torture against a child or children, or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

18 U.S.C. § 1111(a).

B.  Claim II – Failure to Seek Dismissal of Count I or in the Alternative Count II

In Claim II, Mr. Tatar argues that trial counsel was ineffective when he failed to move to dismiss Count 1, which charged Mr. Tatar with conspiracy to murder United States military members, because it was duplicitous with Count 2, which charged Mr. Tatar with attempt to murder United States military members. The government responds that Mr. Tatar's claim is not actually that Count 1 and Count 2 were duplicitous, but that it is in effect a multiplicity argument. One leading treatise has explained the difference between the two legal terms:

> "Duplicity" is the joining of two or more distinct and separate offenses in a single count. The vice of duplicity is that there is no way for a jury to convict on one offense and acquit on another offense contained in the same count. A closely related problem is that, because the jurors have two crimes to consider in a single count, they may convict without reaching a unanimous agreement on either. A general verdict of guilty will not reveal whether the jury unanimously found the defendant guilty of either offense, both offenses, or guilty of one crime and not guilty of the other. This uncertainty could prejudice defendant in sentencing, in any appellate review, and in guarding against double jeopardy. Duplicitous charges also make it more difficult to determine if the earlier alleged crime occurred beyond the statute of limitations.

> "Multiplicity" is charging a single offense in several counts. This may occur when defendant is charged in the indictment with violating two separate crimes, one of which is a lesser included offense of the other. Or, multiplicity may occur where the indictment charges multiple violations of the same statute but these counts are predicated on the same criminal conduct. The vice of multiplicity is that it may lead to multiple punishment for a single crime, an obvious double jeopardy violation. There is also a concern that a "prolix pleading may have some psychological effect upon a jury by suggesting to it that defendant has committed not one but several crimes." It remains permissible to charge a single offense in several counts (although not to convict and punish on more than one for a single crime), but as stated in the Advisory Committee Note to Rule 7(c), the rules are intended to discourage that practice.

1A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE CRIMINAL § 142 (4th ed.).

Mr. Tatar's duplicitous argument is without merit. As explained above, duplicity is the joining of two or more distinct offenses into a single count. Count 1 charged Mr. Tatar with conspiracy to murder United States military contrary to 18 U.S.C. § 1114. While § 1114 was the object of the conspiracy in Count 1, Count 1 only charged Mr. Tatar with conspiracy, not attempted murder as well such that Count 1 was not duplicitous. Thus, his trial counsel was not ineffective for failing to move to dismiss Count 1 as it was not duplicitous.

To the extent that Mr. Tatar's amended § 2255 motion could be perceived as making a multiplicity argument in Claim II, he also fails to show that he is entitled to relief. An attempt conviction requires that an individual acted with the requisite intent to murder United States military "and performed an act that constituted a substantial step towards the commission of the crime." *Salahuddin*, 765 F.3d at 349 (citing *United States v. Manzo*, 636 F.3d 56, 66 (3d Cir. 2011)); *see also United States v. Pavulak*, 700 F.3d 651, 669 (3d Cir. 2012) ("The crime of attempt requires the specific intent to commit a crime . . . and a substantial step towards the commission of that crime.") (citations omitted). Comparatively, "[t]o prevail in a conspiracy prosecution, the government must prove each of the following elements beyond a reasonable doubt: (1) an agreement between two or more persons to achieve an unlawful goal; (2) the defendant intentionally joined the agreement, with knowledge of its objective; and (3) an overt act taken in furtherance of the conspiracy by a co-conspirator." *United States v. Whiteford*, 676 F.3d 348, 356-57 (3d Cir. 2012) (citing *United States v. Rigas,* 605 F.3d 194, 206 (3d Cir. 2010) (en banc); *United States v. Gebbie,* 294 F.3d 540, 544 (3d Cir. 2002)). Thus, as their definitions make clear, attempt requires a substantial step towards the commission of the crime, whereas

conspiracy requires an agreement between two or more persons. Accordingly, "because the attempt and conspiracy charges each 'require[d] proof of an additional fact which the other does not,'" *see United States v. Lopez*, 100 F. App'x 32, 36 (2d Cir. 2004) (not precedential) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)), the claims were not multiplicitous because Count 1 and Count 2 did not charge Mr. Tatar with a single offense in different counts. Therefore, Mr. Tatar's trial counsel was not ineffective for failing to move to dismiss either Count 1 or Count 2 as multiplicitous of the other.

Accordingly, for the foregoing reasons, Mr. Tatar is not entitled to relief in Claim II.

C. Claim III – Failure to Object to Constructive Amendment to Indictment

In Claim III, Mr. Tatar makes a related argument to Claim I. More specifically, Mr. Tatar asserts that trial counsel was ineffective when he failed to object to a constructive amendment of the indictment when this Court during the jury charge purportedly "removed from jury's consideration the element of murder proscribed by the statute (e.g., 18 U.S.C. §§ 1117, 1114)[.]" (Dkt. No. 27 at p. 36)

As explained by the Third Circuit:

> An indictment is constructively amended when evidence, arguments, or the district court's jury instructions effectively "amend[s] the indictment by broadening the possible bases for conviction from that which appeared in the indictment." *United States v. Lee,* 359 F.3d 194, 208 (3d Cir. 2004). We have held that a constructive amendment is an exceptional category of error because it violates a basic right of criminal defendants, the grand jury guarantee of the Fifth Amendment. *United States v. Syme*, 276 F.3d 131, 154 (3d Cir. 2002) (applying *United States v. Adams,* 252 F.3d 276 (3d Cir. 2001)). "A constructive amendment to the indictment constitutes 'a *per se* violation of the fifth amendment's grand jury clause.' " *Id.* at 148 (quoting *United States v. Castro,* 776 F.2d 1118, 1121-22 (3d Cir. 1985)). A constructive amendment of the charges against a defendant deprives the defendant of his/her "substantial right to be tried only on charges presented in an indictment returned by a grand jury." *United States*

> *v. Syme,* 276 F.3d 131, 149 (3d Cir. 2002) (citation omitted). Thus,
> where a trial court constructively amends a jury instruction, our
> plain error analysis presumes prejudice. *Id.*

*United States v. McKee,* 506 F.3d 225, 229 (3d Cir. 2007) (footnote omitted). Contrary to Mr.

Tatar's arguments in his § 2255 motion, this Court's jury instructions did not amount to a

constructive amendment. Indeed, in the superseding indictment, Mr. Tatar was charged in Count

1 with conspiracy to murder members of the United States military. As described in *supra* Part

V.A, this Court did not instruct the jury that Mr. Tatar was charged in Count 1 with murder, but

rather, that he was charged in Count 1 with conspiracy to commit murder. Accordingly, this

Court's instructions did not amount to a constructive amendment because this Court did not

charge the jury that Mr. Tatar was being charged with murder. Rather, the jury was properly

instructed on the elements that the government needed to prove for the jury to find Mr. Tatar

guilty of *conspiracy* to murder United States military members. Therefore, Mr. Tatar's trial

counsel was not ineffective for failing to raise a meritless issue. *See Real*, 600 F.3d at 310.

Accordingly, this Claim does not warrant granting Mr. Tatar relief.

### D.  Claim IV – Failure to Allow Petitioner to Testify

In Claim IV, Mr. Tatar claims that his trial counsel was ineffective due to his failure to

permit him to testify in his own defense. A defendant has the constitutional right to testify on his

own behalf at trial. *See Rock v. Arkansas,* 483 U.S. 44, 51–52 (1987). "The right is personal and

can be waived only by the defendant, not defense counsel." *Unites States v. Leggett,* 162 F.3d

237, 245 (3d Cir.1998) (citations omitted). "If a defendant does waive this right, the waiver must

be knowing, voluntary and intelligent." *Id.* (citations omitted). Where a petitioner claims that his

attorney was ineffective by denying him the right to testify, the *Strickland* standard is used to

analyze the claim. *See Palmer v. Hendricks,* 592 F.3d 386, 394 (3d Cir.2010) (citations omitted).

Mr. Tatar did not testify at trial. Nevertheless, Mr. Tatar claims that he informed counsel that he believed that his personal testimony "was paramount in an effort to place before the court or communicate to the jury a withdrawal defense, i.e., (1) detailing the factual circumstances demonstrating an effort to perform a withdrawal from the underlying conspiracy, and (2) detailing the actual behavior of Detectives/F.B.I. agents (interviewing officers) during the course of that effort." (Dkt. No. 27 at p. 41)

Mr. Tatar has supplied the Court with his affidavit which is attached to his reply brief in which he states as follows:

> (3) Affiant aver that it is an undeniable fact that in advance of trial as part of conference with counsel affiant informed the attorney Richard Sparaco of his desire to testify at trial in his own defense. Further informing counsel that I thought (believed) my testimony would be integral to communicating to the jury the intricate details related to my effort to withdraw from alleged crimes; at the time the attorney expressed no difficulty or umbrage to me "taking the stand" and testifying as part of my trial, but, assured me it can be done and he will prepare for it.

> (4) Then there became a point in time at a later date, while sitting in proximity to, and in "ear-shot" of a codefendant Mr. Shain Duka, that I once again informed or reminded my attorney of my desire to testify in my own defense. The attorney's only response was to tersely state that he wasn't prepared to put me on the stand, and likewise, he denied my request to take the stand in my own defense. In support of this averment in relation to that single occasion I provide an affidavit appended hereto from the codefendant (identified above) who also heard counsel deny my request to take the stand and further stating that he was unprepared to put me on the stand for the above stated purpose.

> (5) Affiant aver that the issues or subject matter which I desired to make the jury aware of through my testimony are relevant and germane to my withdrawal defense, and it's affiant's belief a failure to allow my testimony obstructed that defense. Such is important because if these material facts was properly conveyed to the jury they very well could have acquitted affiant on Count One as they did on Count Two; particularly once they got a clear

> understanding as to why I, somehow, stayed involved in the case
> after a unilateral effort to contact law enforcement.

(Dkt. No. 38 at p. 15) Mr. Tatar states that his expressed desire to testify in his own defense fell

on "deaf ears," as his trial counsel failed to invest time to investigate a withdrawal defense and

discouraged him from taking the stand. (*See* Dkt. No. 27 at p. 41) Indeed, Mr. Tatar explains that

there came a time in advance of trial during a legal conference that included the presence of his

co-defendant Shain Duka "in which [Mr. Tatar] informed his attorney of his desire to testify at

trial before the jury; but, the attorney simply retorted (tersely) that he wasn't prepared to put

Petitioner on the stand, and therefore, discouraged the idea altogether." (*Id.* at p. 44) Mr. Tatar

has attached an affidavit of Shain Duka to his § 2255 motion in further support of Claim IV

which states as follows:

> 1. I, Shain Duka, have personal knowledge of a conversation
> between my codefendant, Serdar Tatar, and his attorney, Richard
> Sparaco, in the case *United States v. Shnewer et al*, No. 07-459,
> 2008 WL 4860403 (District of New Jersey).
> 2. Serdar Tatar clearly and explicitly made know to his attorney,
> Richard Sparaco, that he intended to take the stand in his own
> defense.
> 3. Mr. Sparaco denied his request stating that he was unprepared to
> call Serdar Tatar to testify and thus would not call him to the stand.
> 4. I have personal knowledge of this conversation because I was
> sitting right next to both Mr. Sparaco and Serdar Tatar at the
> defense table and was able to hear the entire conversation.
> 5. It was clear that Serdar Tatar intended to take the stand and his
> attorney prevented him from doing so.

(Dkt. No. 27 at p. 78)

In further support of this Claim, Mr. Tatar explains what he would have testified to if he

took the witness stand in his own defense:

> (1) There became a point in time while conducting business at
> Petitioner's 7/11 Store that a particular Philadelphia Police
> sergeant, Sean Dandruff, known personally by Pet., dropped in to
> make a purchase. Petitioner, upon seeing the officer in formed him

that he needed to speak with him about a matter of national
security (exact words).

(2) Petitioner informed the Officer Dandruff of what he believed to
be a conceivable plot to cause some type of harm or danger to the
Fort Dix Military Base. The officer in turn wrote down Petitioners
contact information and told him the F.B.I. would be in touch with
him soon. The officer advised, that in the mean time to stay in
touch with those persons (suspects), in order to get more
information for the F.B.I. when they pay a visit.

(3) Eventually, approximately three weeks later, a Joint Terrorist
Task Force (hereinafter JTTF) Officer Jay Rycek of the
Philadelphia Police Dept., and the F.B.I. Special Agent Sean
Brenman show[e]d-up at the 7/11 store.

(4) When the Agents finally appeared Petitioner informed them
"first of all, whatever is going on I don't have anything to do with
it, other than I want to help stop it." The Agents asked Petitioner
what was going on? Petitioner informed them that a guy named
Omar approached him and inquired about the Fort Dix Military
base and maps related to the base. And he, Omar, spoke something
to the effect of wanting the Americans to pay for what they have
been doing to Muslims.

(5) Petitioner informed the agents that, as soon as, he heard the
statements from Omar his emotional alarms went off (in his head),
and he could barely contain himself; thus, he's contacted them, and
repeatedly reminded them that he wanted to help them in the
matter.

(6) Then Petitioner tried to give the agents a portion of recorded
conversation between Omar and himself that he was able to record
and preserve on his Cell Phone in order to show the agents it's the
"real deal". Petitioner played the small clip for the agents about
four times, but the Agent Rycek suddenly appeared/seemed very
angry, turning very red in the face – as if he was surprised or not
expecting the Petitioner would have recorded the exchange with
Omar. There also appeared to be some conflicting/contradictory
emotions where the other Agent Sean Brenman appeared more
intrigued and amicable to the idea of underlying record, where he
also sought to hear the record over again.

(7) However, when Agent Brenman was done with listening to the
recording, instead of taking it with them as something to their
investigation, he simply instructed Petitioner not to loose [sic] it.

Then the agents inquired as to who else was involved in the situation? And Petitioner informed that another guy named Muhammad. Petitioner did not know Muhammad's last name, nor where he actually lived, so he simply offered the agents his phone number. And volunteered that he believed the agents should be able to get whatever additional information they needed about the maps from Muhammad. Furthermore, that Muhammad frequented Petitioner's restaurant across from the Military Air Base.

(8) In a strange turn of events, when Petitioner offered Muhammad's number to Agent Rycek, he again produced strange contradictory energy and actions via his facial expressions and overall body language – suggesting he didn't want to take the info. from Pet[itioner]. In fact, the agent suddenly exhaled, "no no, no, we don't need that right now"! And again there was this awkward silence between the agents and Petitioner. The agents behavior was scaring Petitioner, [p]articularly where the two agents kept exchanging conflicting looks with each other. And just as Petitioner was about to ask "what's going on here"? Agent Brenman interjected and said:  "I'll take that number", and Petitioner immediately gave it to him. The agent wrote the number of one who's now become Petitioner's convicted coconspirator Muhammad Shenewer [sic]. Ironically, none of the fore going information has been properly preserved as what is legally known as 302 material, or agents personal notes.

(9) Quite the contrary, the foregoing facts was obfuscated, misrepresented and advanced before the trial court by the prosecution as part of their case-in-chief in the limited context case as if Petitioner has made up a bunch of lies, e.g., about the maps, or that Petitioner told them he did not know any one was involved in underlying crimes.

(Dkt. No. 27 at p. 44-45)

The government argues in its response that this Court can deny Claim IV because Mr. Tatar has failed to establish either prong of *Strickland*. In support of its arguments, the government includes an affidavit from Mr. Sparaco, Mr. Tatar's trial counsel. Mr. Sparaco's affidavit paints quite a different picture with respect to his interactions with Mr. Tatar and with respect to the advice and counsel he gave him. That type of evidence is important to determine whether Mr. Tatar has satisfied the first prong of *Strickland* – whether Mr. Sparaco's counsel fell

below an objective standard of reasonableness. However, this Court will decline to engage in an analysis on the first prong of *Strickland* because Claim IV can and will be decided on the merits at this time on the second prong of *Strickland* – whether petitioner has made the requisite showing of prejudice to warrant granting relief.

As Mr. Tatar's amended § 2255 motion makes clear, he wanted to testify so that he could attempt to establish the affirmative defense of his withdrawal from the conspiracy. As the United States Supreme Court has explained with respect to the withdrawal defense:

> Far from contradicting an element of the offense, withdrawal presupposes that the defendant committed the offense. Withdrawal achieves more modest ends than exoneration. Since conspiracy is a continuing offense, *United States v. Kissel,* 218 U.S. 601, 610, 31 S. Ct. 124, 54 L. Ed. 1168 (1910), a defendant who has joined a conspiracy continues to violate the law "through every moment of [the conspiracy's] existence," *Hyde v. United States,* 225 U.S. 347, 369, 32 S. Ct. 793, 56 L. Ed. 1114 (1912), and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot, *Pinkerton v. United States,* 328 U.S. 640, 646, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). Withdrawal terminates the defendant's liability for postwithdrawal acts of his co-conspirators, but he remains guilty of conspiracy.
>
> Withdrawal also starts the clock running on the time within which the defendant may be prosecuted, and provides a complete defense when the withdrawal occurs beyond the applicable statute-of-limitations period. A complete defense, however, is not necessarily one that establishes the defendant's innocence. For example, we have held that although self-defense may entirely excuse or justify aggravated murder, "the elements of aggravated murder and self-defense [do not] overlap in the sense that evidence to prove the latter will often tend to negate the former." Martin, *supra,* at 234, 107 S. Ct. 1098; see *Leland v. Oregon,* 343 U.S. 790, 794–796, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952) (same for insanity defense). Likewise, although the statute of limitations may inhibit prosecution, it does not render the underlying conduct noncriminal. Commission of the crime *within the statute-of-limitations period* is not an element of the conspiracy offense. *See United States v. Cook,* 17 Wall. 168, 180, 21 L. Ed. 538 (1872). The Government need not allege the time of the offense in the indictment, *id.,* at 179–180, and it is up to the defendant to raise the limitations

> defense, *Biddinger v. Commissioner of Police of City of New York,*
> 245 U.S. 128, 135, 38 S. Ct. 41, 62 L. Ed. 193 (1917). A statute-of-
> limitations defense does not call the criminality of the defendant's
> conduct into question, but rather reflects a policy judgment by the
> legislature that the lapse of time may render criminal acts ill suited
> for prosecution. *See, e.g., Toussie v. United States,* 397 U.S. 112,
> 114–115, 90 S. Ct. 858, 25 L. Ed. 2d 156 (1970). Thus, although
> union of withdrawal with a statute-of-limitations defense can free
> the defendant of criminal liability, it does not place upon the
> prosecution a constitutional responsibility to prove that he did not
> withdraw. As with other affirmative defenses, the burden is on
> him.

*Smith v. United States*, 133 S. Ct. 714, 719-20 (2013).

As the United States Supreme Court in *Smith* makes clear, a withdrawal defense would have presupposed that Mr. Tatar committed the offense such that even upon a withdrawal, Mr. Tatar still would have remained guilty of the conspiracy. *See* 133 S. Ct. at 721 ("His individual change of heart (assuming it occurred) could not put the conspiracy genie back in the bottle). Instead, what Mr. Tatar's proposed withdrawal defense had the potential to do is start the running of the statute of limitations on the conspiracy charge. However, there is no dispute that the May 7, 2007 initial indictment against Mr. Tatar was brought within the relevant statute of limitations. *See* 18 U.S.C. § 3282 ("Except as otherwise provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."). Thus, Mr. Tatar's proposed withdrawal defense would not have made the government's indictment against him untimely. Accordingly, he has failed to show to a reasonable probability that the outcome of his trial would have been different because his withdrawal defense, even if,

assuming *arguendo*, Mr. Tatar did in fact withdrawal from the conspiracy, would not have altered the fact that he was guilty of conspiracy in the first place.[3]

A brief interlude is warranted differentiating Mr. Tatar's case from the Duka brothers § 2255 motions where this Court recently conducted an evidentiary hearing on similar ineffective assistance of counsel claims regarding a failure to testify. The Duka brothers claim in their § 2255 motions that their decision not to testify was the result of attorney coercion. The Duka brothers all claim that they did not voluntarily waive their right to testify at trial because their decision was the product of attorney coercion when each of their attorneys told them that they were unprepared to put them on the stand despite each brothers' stated intent of wanting to testify. *See Duka v. United States*, Nos. 13-3664, 13-3665, 13-3666, 2015 WL 5768786, at *4-5 (D.N.J. Sept. 30, 2015). In an Opinion dated September 30, 2015, this Court stated that it would conduct an evidentiary hearing on the Duka brothers claims of ineffective assistance of counsel when they were denied the right to testify at trial. *See id*. at *6. Indeed, on January 6, 2016, this Court conducted an evidentiary hearing on the Duka brothers' failure to testify ineffective assistance of counsel claims. That hearing was limited to whether the attorney's conduct fell below an objective standard of reasonableness.[4]

Mr. Tatar's amended § 2255 motion is clear that the reason he sought to testify was to pursue a withdrawal defense. Comparatively, the Duka brothers' assert a complete defense in their brief that they wanted to testify to show that they never entered into a conspiracy in the first

---

[3] This Court need not analyze respondent's alternative theory that Mr. Tatar failed to show that he actually withdrew from the conspiracy because his purported withdrawal would not have changed the outcome of the proceedings as Mr. Tatar was still charged with conspiracy within the applicable statute of limitations.

[4] Written summations from those evidentiary hearings are due on February 16, 2016 such that no ruling on the Duka brothers remaining ineffective assistance of counsel claim has been issued at this time.

place. While the Duka brothers offer a complete defense, Mr. Tatar's withdrawal defense is not a complete defense, but rather, only starts the running of the statute of limitations. Assuming *arguendo* that Mr. Tatar affirmatively withdrew from the conspiracy, the only impact of that defense would have been whether the conspiracy charge against him was timely. However, as previously stated, the conspiracy charge was timely. Thus, Mr. Tatar's withdrawal defense, which is the stated *reason* why Mr. Tatar says he wanted to testify, would not have changed the outcome of the proceedings to a reasonable probability because the charge was timely. Accordingly, this Court is clearly able to decide Mr. Tatar's Claim IV solely on the prejudice prong of the *Strickland*. Accordingly, an evidentiary hearing is not warranted on this Claim and Mr. Tatar is not entitled to relief on Claim IV as well.

E. Claim V – Failure of Appellate Counsel to Raise Issue that Count 1 was Duplicitous and that Court Constructively Amended the Indictment through its Jury Instructions

In Claim V, Mr. Tatar claims that appellate counsel (who was also Mr. Sparaco) was ineffective by not raising two issues on appeal; more specifically:  (1) failing to argue that Count 1 was duplicitous; and (2) failing to argue that jury instructions constructively amended the indictment. As indicated above, however, the instructions did not cause Count 1 to become duplicitous (or multiplicitous). *See supra* Part V.B. Furthermore, the jury instructions did not constructively amend the indictment. *See supra* Part V.C. Accordingly, Mr. Tatar's appellate counsel was not ineffective for failing to raise these meritless issues. *See Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) ("[C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.") (citation omitted); *United States v. Jackson*, No. 09-5255, 2010 WL 1688543, at *8 (E.D. Pa. Apr. 27, 2010) ("Under *Strickland*, Jackson's appellate counsel cannot be ineffective for failing to raise a meritless issue on appeal.") (citing *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999)). Therefore, Mr. Tatar is not entitled to relief in Claim V.

F.  Claim VI – Failure of Trial to Seek Post-Verdict Dismissal of Count 1 due to Retroactive
Misjoinder and Failure of Appellate Counsel to Raise Issue of Retroactive Misjoinder on
Appeal

In Claim VI, Mr. Tatar argues that trial counsel was ineffective post-verdict for failing to

seek a dismissal of Count 1 on the basis of retroactive misjoinder/prejudicial spillover.[5] In *Cross*,

308 F.3d at 317, the Third Circuit outlined that prejudicial spillover occurs as follows:

> [w]hen a defendant is convicted on two counts involving different
> offenses at a single trial and an appellate court reverses his
> conviction on one of them, prejudicial spillover can occur only if
> the evidence introduced to support the reversed count would have
> been inadmissible at a trial on the remaining count.

*Id.* (citing *United States v. Eufrasio*, 935 F.2d 553, 571 (3d Cir. 1991); *United States v. Edwards*,

303 F.3d 606, 640 (5th Cir. 2002); *United States v. Aldrich*, 169 F.3d 526, 528 (8th Cir. 1999)).

A court considers two issues when analyzing whether prejudicial spillover has occurred:  "(1)

whether the jury heard evidence that would have been inadmissible at a trial limited to the

remaining valid count (*i.e.,* 'spillover' evidence); and (2) if there was any spillover evidence,

whether it was prejudicial (*i.e.,* whether it affected adversely the verdict on the remaining

count)." *See Cross*, 308 F.3d at 317.

Mr. Tatar has failed to show that prejudicial spillover has occurred in this case. While

Mr. Tatar was found guilty by a jury of conspiracy to murder members of the United States

military in Count 1, he was found not guilty by the jury of attempt to murder members of the

United States military in Count 2. Thus, the fundamental premise of the possibility of prejudicial

spillover, i.e., subsequent reversal of a count by an appellate court, is not present in Mr. Tatar's

case. Indeed, as one court has noted:

> where the record indicates that the jury was able to distinguish
> between counts or between defendants, and to assess separately the

---

[5] The Third Circuit prefers the use of the term "prejudicial spillover" as opposed to "retroactive
misjoinder," *see United States v. Cross*, 308 F.3d 308, 317 n.14 (3d Cir. 2002).

> evidence pertinent to each, we have found no basis for concluding
> that a new trial was warranted because of prejudicial spillover. The
> absence of such spillover is most readily inferable where the jury
> has convicted a defendant on some counts but not on others.

*United States v. Hamilton*, 334 F.3d 170, 183 (2d Cir. 2003) (citations omitted).

Furthermore, even if prejudicial spillover was relevant to this case, Mr. Tatar has failed to make out a case of prejudicial spillover such that counsel was not ineffective for failing to raise a meritless issue. Indeed, Mr. Tatar fails to show that evidence on the attempted murder charge would have been inadmissible with respect to the conspiracy charge.

Mr. Tatar also raises this prejudicial spillover issue with respect to the jury instructions. More specifically, Mr. Tatar's argues that there was prejudicial spillover because this Court instructed the jury that the object of the conspiracy (murder), was the crime that the defendants (including Mr. Tatar) allegedly attempted to commit. He complains that "attempted murder under 18 U.S.C. § 1114 could never be the same as conspiracy to murder[.]" (Dkt. No. 27 at p. 53)

Mr. Tatar misconstrues and misreads this Court's instructions to the jury. As described in *supra* Part V.A, this Court properly instructed the jury on the elements of conspiracy. To reiterate, this Court instructed the jury that to find Mr. Tatar guilty of conspiracy to murder members of the United States military, it had to find that the government had proved beyond a reasonable doubt three elements:

> First. *That two or more persons agreed to murder members of the uniformed services of the United States, as charged in the indictment. And I will explain the elements of murder of members of the uniformed services of the United States shortly.*
>
> Second. That the defendant you are considering knowingly and willfully joined the agreement or conspiracy knowing of its objective to murder members of the uniformed services of the United States.

And third. That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

(Trial. Tr. at p. 6301-02 (emphasis added)). Subsequently, this Court then instructed the jury on what was necessary to find Mr. Tatar (and his co-defendants) guilty on Count 2 of attempt to murder members of the United States military. More specifically, this Court instructed the jury as follows:

Count two of the indictment charges that all five defendants from on or about January 3[ ]2006 to on or about May 7, 2007, did knowingly and willfully attempt to kill officers and employees of the United States and of an agency in the Executive Branch of the United States Government, namely members of the uniformed service, which such officers and employees were engaged in and an account of the performance of official duties, and persons assisting such officers and employees in the performance of such duties and on account of that assistance.

In violation of Title 18, U.S. Code Section 1114 and Title 18, U.S. Code Section 2.

Title 18, U.S. Code Section 1114 provides:

Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government, including any member of the uniformed services while such officer or employee is engaged in or or on account of the performance of official duties, or any person assisting such an officer or employee of in the performance of such duties or on account of that assistance shall be punished.

A criminal attempt to commit a crime of murder of members of the United States uniformed services may occur even though the defendant did not actually complete the crime.

In order to find a particular defendant guilty of attempt to murder members of the uniformed services, you must find that the government proved beyond a reasonable doubt each of the following two elements.

26

First, the defendant you are considering intended to commit the crime of murder of members of the United States uniformed services as I have previously defined that offense.

And, second, that the defendant you are considering knowingly and willfully performed an act constituting a substantial step toward the commission of the crime of murder of members of the United States unformed services which strongly corroborates or confirms that the defendant intended to commit that crime.

With respect to the first element, you may not find any defendant guilty of attempt to commit murder of members of the United States uniformed services merely because he thought about it. You must find that the evidence proved beyond a reasonable doubt that a particular defendant's mental state passed beyond the stage of thinking about the crime to actually intending to commit it.

With respect to the substantial step element, you may not find any defendant guilty of attempt to commit murder of members of the United States uniformed services merely because he made some plans to or some preparation for committing that crime. Instead, you must find that a particular defendant took some firm, clear undeniable action to accomplish his intent to commit murder of members of the uniformed services. However, the substantial step element does not require the Government to prove that the defendant did everything except the last act necessary to complete the crime.

In my instructions the [sic] regarding Count 1, conspiracy to murder members of the United States uniformed services, service, I gave you instructions about the crime that was the object or goal of the conspiracy, which was murders of members of the uniformed services. In Count 2, the crime that the defendants allegedly attempted to commit is the same crime that they allegedly *conspired* to commit in Count 1. My instruction for Count 1 regarding the crime of murder of members of the uniformed services are equally applicable to the crime of attempted murder charged in Count 2.

(Trial Tr. at p. 6318-21). Mr. Tatar claims that the final paragraph quoted above meant that the

jury was instructed that attempted murder and conspiracy to commit murder were the same thing.

However, this Court was clear to differentiate between conspiracy and attempt. By way of

example only, the jury was instructed that to find Mr. Tatar guilty of conspiracy, it needed to find

that the government had shown that there was an "agreement" beyond a reasonable doubt. Comparatively, with respect to attempt, the jury was specifically instructed that the government needed to find that Tatar committed a "substantial step." Thus, this Court's instructions did not equate the two charged crimes against Mr. Tatar. Accordingly, Mr. Tatar's trial counsel was not ineffective for failing to raise this meritless issue post-verdict.

Mr. Tatar also argues in Claim VI that his appellate counsel was ineffective on appeal for failing to raise the issues associated with Claim VI. However, as discussed *supra*, because there was no prejudicial spillover and the Court's instructions did not equate conspiracy and attempt as the same crime, Mr. Tatar's appellate counsel was not ineffective on appeal for failing to raise these meritless issues on appeal. Accordingly, for these reasons, Mr. Tatar is not entitled to relief on Claim VI.

G. Claim VII – Sentence

Mr. Tatar asserts in his final claim that this Court's application of the terrorist sentencing enhancement and the official victim enhancement was rendered unconstitutional by *Alleyne v. United States*, 133 S. Ct. 2151 (2013). "In *Alleyne*, the Supreme Court . . . clarified that, under the Sixth Amendment, "'any facts that increase the prescribed range of penalties to which a criminal defendant is exposed' are elements of the crime" and must be found beyond a reasonable doubt." *United States v. Reyes*, 755 F.3d 210, 212 (3d Cir. 2014) (quoting *Alleyne*, 133 S. Ct. at 2160 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). While the Supreme Court held that facts that increase mandatory minimums must be submitted to the jury, the Supreme Court was also clear to recognize that "broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." *Alleyne*, 133 S. Ct. at 2163 (citing *Dillon v. United States*, 130 S. Ct. 2683, 2692 (2010))).

Mr. Tatar's *Alleyne* based argument does not entitle him to relief for two reasons. First, as the Third Circuit has noted, "*Alleyne* did not curtail a sentencing court's ability to find facts relevant in selecting a sentence *within* the prescribed statutory range." *United States v. Smith*, 751 F.3d 107, 117 (3d Cir. 2014) (citing *Alleyne*, 133 S. Ct. at 2160). In this case, Mr. Tatar was sentenced on the one charge that he was convicted of, namely, conspiracy to murder American soldiers in violation of 18 U.S.C. § 1117. Section 1117 does not set forth a mandatory minimum, but instead, states that a person convicted under 18 U.S.C. § 1117 "shall be punished by imprisonment for any term of years or for life." Therefore, as Mr. Tatar's sentence did not involve a mandatory minimum upon which this Court's fact-finding increased the sentence, the principles set forth in *Alleyne* were not violated. *Accord United States v. Staton*, 605 F. App'x 110, 117 n.13 (3d Cir. 2015) (District Court did not violate *Alleyne* because none of court findings resulted in imposition of a mandatory minimum sentence); *United States v. Treminio*, 538 F. App'x 232, 233 (3d Cir. 2013) (*Alleyne* not applicable because enhancement did not increase any mandatory minimum to which defendant was subjected to).

Additionally, and perhaps more importantly, "*Alleyne* does not apply retroactively to cases on collateral review." *Reyes*, 755 F.3d at 212 (footnote omitted). Thus, *Alleyne* is even inapplicable to these collateral review proceedings. Therefore, Mr. Tatar has failed to show that he is entitled to relief in Claim VII.

H. Request for the Appointment of Counsel

Mr. Tatar has renewed his request for the appointment of counsel. (*See* Dkt. No. 42) Mr. Tatar does not have a constitutional right to counsel in habeas proceedings. *See Reese v. Fulcomer,* 946 F.2d 247, 263 (3d Cir.1991), *superseded on other grounds by statute,* 28 U.S.C. § 2254. However, 18 U.S.C. § 3006A(a)(2)(B) provides that the court has discretion to appoint

counsel where "the court determines that the interests of justice so require ..." In *Reese,* the Third Circuit explained that in determining whether counsel should be appointed, a court "must first decide if petitioner has presented a nonfrivolous claim and if the appointment of counsel will benefit the petitioner and the court. Factors influencing a court's decision include the complexity of the factual and legal issues in the case, as well as the pro se petitioner's ability to investigate facts and present claims." *Reese,* 946 F.2d at 263–64. In this case, the Court finds that the appointment of counsel is not warranted. As stated in this Opinion, Mr. Tatar's claims lack merit such that the appointment of counsel is not justified.

I.   <u>Certificate of Appealability</u>

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2255. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 327 (2003). Applying this standard, the Court finds that a certificate of appealability shall not issue in this case on Mr. Tatar's claims.

## VI.    CONCLUSION

For the foregoing reasons, Mr. Tatar is not entitled to relief on any of his claims set forth in his amended § 2255 motion nor is an evidentiary hearing on any of his claims warranted. An appropriate order will be entered.


DATED:  February  9,  2016                                        s/Robert B. Kugler
                                                                                ROBERT B. KUGLER
                                                                                United States District Judge