**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SERDAR TATAR, | : | |
| Petitioner, | : | Civ. No. 13-3317 (RBK) |
| v. | : | |
| UNITED STATES OF AMERICA, | : | **OPINION** |
| Respondent. | : | |

**ROBERT B. KUGLER, U.S.D.J.**

## I.   INTRODUCTION

Petitioner, Serdar Tatar, is a federal prisoner proceeding *pro se* with an amended motion to vacate, correct, or set aside his federal sentence pursuant to 28 U.S.C. § 2255. Previously, this Court denied Mr. Tatar's § 2255 motion in its entirety without the need for an evidentiary hearing. Presently pending before this Court are two identical motions for reconsideration that Mr. Tatar filed ten days apart from one another. The Clerk will be ordered to reopen this case so that these two motions can be analyzed. For the following reasons, Mr. Tatar's motions for reconsideration will be denied.

## II.   BACKGROUND

Mr. Tatar is one of five individuals[1] who was arrested in in May, 2007. On direct appeal of Mr. Tatar's judgment of conviction, the United States Court of Appeals laid out the factual underpinnings giving rise to the convictions of the five defendants as follows:

> Shnewer, the Duka brothers, and Tatar are a group of young men
> who lived in New Jersey and developed an interest in violent jihad,
> particularly attacks against the United States military. Defendants,
> who had known each other since high school, came to the FBI's

---

[1] Dritan Duka, Shain Duka, Eljvir Duka and Mohamed Shnewer were the other four other co-conspirators.

attention after it received a copy of a video that was brought to a Circuit City store in Mt. Laurel, New Jersey, for copying. The video dated from January 2006 and depicted the five defendants and others at a firing range in the Pocono Mountains, shooting weapons and shouting "Allah Akbar!" and "jihad in the States."

Over the course of the next sixteen months, the FBI deployed two cooperating witnesses, Mahmoud Omar and Besnik Bakalli, to monitor defendants' activities. The evidence presented at trial showed that, between January 2006 and May 2007, defendants viewed and shared videos of violent jihadist activities, including beheadings, around the world; they viewed and shared videos of lectures advocating violent jihad against non-Muslims; they sought to acquire numerous weapons, including automatic firearms and rocket-propelled grenades; they returned to the Poconos, where they again engaged in shooting practice; they discussed plans to attack the United States military; they conducted research and surveillance on various potential targets for such an attack in New Jersey, Pennsylvania, and Delaware; and they procured a map of the United States Army Base at Fort Dix to use in planning and coordinating such an attack.

With respect to the individual defendants, the evidence demonstrated the following:

Mohamad Shnewer is a naturalized American citizen who was born in Jordan. He admired and sought to emulate the "nineteen brothers," i.e., the September 11 hijackers, Osama bin Laden, and the leader of al Qaeda in Iraq, Abu Musab al-Zarqawi. Shnewer openly discussed and planned attacks on military targets in New Jersey, Pennsylvania, and Delaware. Along with Omar, the government informant, he staked out the United States Army Base at Fort Dix, McGuire Air Force Base, Lakehurst Naval Air Station, and the United States Army Base at Fort Monmouth in New Jersey; the United States Coast Guard Base in Philadelphia, Pennsylvania; and Dover Air Force Base in Delaware. Shnewer also considered attacking the federal government building at 6th and Arch Streets in Philadelphia and drove by the building to determine whether such an attack would be feasible. To accomplish an attack on these targets, Shnewer proposed deploying a gas tanker truck as a bomb, using roadside bombs or surface-to-air missiles, and spraying military targets with machinegun fire. He sought to acquire AK–47 machineguns from Omar to use in such an attack.

Dritan, Shain, and Eljvir Duka are brothers who were born in Albania. During the events that were the subject of the trial, they were in the United States illegally. In 2006 and 2007, the Dukas took at least two trips to the Poconos to train for jihad by firing weapons, attempting to buy automatic weapons, discussing jihad, and watching violent jihadist videos. The Dukas befriended government informant Bakalli, a fellow Albanian, and encouraged him to join them in avenging Muslims who had been oppressed by the United States and Israel. They viewed and praised a lecture, *Constants on the Path to Jihad,* by Anwar al-Awlaki, the prominent cleric and proponent of attacks against the United States military, and videos depicting attacks on American soldiers by violent jihadists in Iraq and elsewhere. In recorded conversations presented at trial, the Dukas described beheadings depicted in the videos as just punishment for traitors. The Dukas watched the beheading videos over and over again until they became inured to the spectacle. Dritan told Bakalli that, although at first he "couldn't take it," "[n]ow I see it and it's nothing, I do not care. I saw hundreds being beheaded." Similarly, Eljvir told Bakalli that the beheadings were difficult to watch at first, but that "[n]ow we can watch it no problem."

Like Shnewer, the Dukas sought to acquire firearms to further their plans. They could not acquire weapons lawfully because they were in the country illegally, so they turned to the black market. By January 2007, the three brothers told Bakalli they had acquired a shotgun, two semi-automatic rifles, and a pistol, and they continued to look for opportunities to buy machineguns. Later that spring, Dritan Duka ordered nine fully automatic weapons—AK–47s and M–16s—from a contact of Omar's in Baltimore. The FBI arranged a controlled transaction, and, on May 7, 2007, Dritan and Shain Duka went to Omar's apartment to retrieve their weapons. After handing Omar $1,400 in cash, Dritan and Shain examined and handled four fully automatic machineguns and three semiautomatic assault rifles. They asked Omar for garbage bags to conceal the weapons (so they would look like golf clubs) as they carried them out to the car. Before they could get there, however, federal and state law enforcement officers entered Omar's apartment and arrested them. The entire transaction was captured on video by equipment installed in Omar's apartment by the FBI and was shown to the jury at trial.

Serdar Tatar is a lawful permanent resident in the United States who was born in Turkey. Tatar appears in the video of defendants' January 2006 training trip to the Poconos. After extensive discussions with Omar about Shnewer's plan to attack Fort Dix,

> Tatar agreed to help by providing Omar with a map of Fort Dix to use in planning such an attack. Regarding the overall plan to attack Fort Dix, Tatar told Omar in a recorded conversation, "I'm in, honestly, I'm in."
>
> All five defendants were arrested on May 7, 2007, after Dritan and Shain Duka completed the controlled firearm purchase from Omar.

*United States v. Duka*, 671 F.3d 329, 333–35 (3d Cir. 2011).

Mr. Tatar was ultimately convicted after a jury trial of conspiracy to murder members of the United States military in violation of 18 U.S.C. § 1117. He received a sentence of 396 months imprisonment. The Third Circuit affirmed the judgment of conviction against Mr. Tatar in December, 2011. *See Duka*, 671 F.3d at 329.

Thereafter, in 2013, Mr. Tatar filed a § 2255 motion and then an amended § 2255 motion. The amended motion raised the following ineffective assistance of counsel claims:

1. Failure to object to the jury charge when it reduced the burden of proof ("Claim I").

2. Failure to seek dismissal of Count I of the indictment (conspiracy to murder members of the United States military) ("Claim II").

3. Failure to object to a constructive amendment to the indictment ("Claim III").

4. Failure to allow Mr. Tatar to testify and obstructing his right to present a defense ("Claim IV").

5. Failure of appellate counsel to raise Claims II and III on appeal ("Claim V").

6. Failure of trial counsel post-verdict to seek to dismiss the remaining count of conspiracy due to retroactive misjoinder and the failure of appellate counsel to raise the issue of retroactive misjoinder on appeal ("Claim VI").

On February 11, 2016, this Court denied all of Mr. Tatar's claims and denied a certificate of appealability on all of his claims as well.[2] Most relevant to Mr. Tatar's pending motions for reconsideration was this Court's discussion of Claim IV. This Court analyzed Claim IV as follows:

> In Claim IV, Mr. Tatar claims that his trial counsel was ineffective due to his failure to permit him to testify in his own defense. A defendant has the constitutional right to testify on his own behalf at trial. *See Rock v. Arkansas*, 483 U.S. 44, 51–52 (1987). "The right is personal and can be waived only by the defendant, not defense counsel." *Unites States v. Leggett*, 162 F.3d 237, 245 (3d Cir.1998) (citations omitted). "If a defendant does waive this right, the waiver must be knowing, voluntary and intelligent." *Id.* (citations omitted). Where a petitioner claims that his attorney was ineffective by denying him the right to testify, the *Strickland* standard is used to analyze the claim. *See Palmer v. Hendricks*, 592 F.3d 386, 394 (3d Cir. 2010) (citations omitted).
>
> Mr. Tatar did not testify at trial. Nevertheless, Mr. Tatar claims that he informed counsel that he believed that his personal testimony "was paramount in an effort to place before the court or communicate to the jury a withdrawal defense, i.e., (1) detailing the factual circumstances demonstrating an effort to perform a withdrawal from the underlying conspiracy, and (2) detailing the actual behavior of Detectives/F.B.I. agents (interviewing officers) during the course of that effort." (Dkt. No. 27 at p. 41)
>
> Mr. Tatar has supplied the Court with his affidavit which is attached to his reply brief in which he states as follows:
>
>> (3) Affiant aver that it is an undeniable fact that in advance of trial as part of conference with counsel affiant informed the attorney Richard Sparaco of his desire to testify at trial in his own defense. Further informing counsel that I thought (believed) my testimony would be integral to communicating to the jury the intricate details related to my effort to withdraw from alleged crimes; at the time the attorney expressed no difficulty or umbrage to me "taking the stand" and testifying as part of my trial,

---

[2] On February 18, 2016, this Court entered an order amending the February 11, 2016 Opinion to correct a typographical error.

5

> but, assured me it can be done and he will prepare for it.
>
> (4) Then there became a point in time at a later date, while sitting in proximity to, and in "ear-shot" of a codefendant Mr. Shain Duka, that I once again informed or reminded my attorney of my desire to testify in my own defense. The attorney's only response was to tersely state that he wasn't prepared to put me on the stand, and likewise, he denied my request to take the stand in my own defense. In support of this averment in relation to that single occasion I provide an affidavit appended hereto from the codefendant (identified above) who also heard counsel deny my request to take the stand and further stating that he was unprepared to put me on the stand for the above stated purpose.
>
> (5) Affiant aver that the issues or subject matter which I desired to make the jury aware of through my testimony are relevant and germane to my withdrawal defense, and it's affiant's belief a failure to allow my testimony obstructed that defense. Such is important because if these material facts was properly conveyed to the jury they very well could have acquitted affiant on Count One as they did on Count Two; particularly once they got a clear understanding as to why I, somehow, stayed involved in the case after a unilateral effort to contact law enforcement.

(Dkt. No. 38 at p. 15) Mr. Tatar states that his expressed desire to testify in his own defense fell on "deaf ears," as his trial counsel failed to invest time to investigate a withdrawal defense and discouraged him from taking the stand. (*See* Dkt. No. 27 at p. 41) Indeed, Mr. Tatar explains that there came a time in advance of trial during a legal conference that included the presence of his co-defendant Shain Duka "in which [Mr. Tatar] informed his attorney of his desire to testify at trial before the jury; but, the attorney simply retorted (tersely) that he wasn't prepared to put Petitioner on the stand, and therefore, discouraged the idea altogether." (*Id.* at p. 44) Mr. Tatar has attached an affidavit of Shain Duka to his § 2255 motion in further support of Claim IV which states as follows:

> 1. I, Shain Duka, have personal knowledge of a conversation between my codefendant, Serdar Tatar, and his attorney, Richard Sparaco, in the case

> *United States v. Shnewer et al*, No. 07-459, 2008 WL 4860403 (District of New Jersey).
> 2. Serdar Tatar clearly and explicitly made know to his attorney, Richard Sparaco, that he intended to take the stand in his own defense.
> 3. Mr. Sparaco denied his request stating that he was unprepared to call Serdar Tatar to testify and thus would not call him to the stand.
> 4. I have personal knowledge of this conversation because I was sitting right next to both Mr. Sparaco and Serdar Tatar at the defense table and was able to hear the entire conversation.
> 5. It was clear that Serdar Tatar intended to take the stand and his attorney prevented him from doing so.
> (Dkt. No. 27 at p. 78)

In further support of this Claim, Mr. Tatar explains what he would have testified to if he took the witness stand in his own defense:

> (1) There became a point in time while conducting business at Petitioner's 7/11 Store that a particular Philadelphia Police sergeant, Sean Dandruff, known personally by Pet., dropped in to make a purchase. Petitioner, upon seeing the officer in formed him that he needed to speak with him about a matter of national security (exact words).
> (2) Petitioner informed the Officer Dandruff of what he believed to be a conceivable plot to cause some type of harm or danger to the Fort Dix Military Base. The officer in turn wrote down Petitioners contact information and told him the F.B.I. would be in touch with him soon. The officer advised, that in the mean time to stay in touch with those persons (suspects), in order to get more information for the F.B.I. when they pay a visit.
> (3) Eventually, approximately three weeks later, a Joint Terrorist Task Force (hereinafter JTTF) Officer Jay Rycek of the Philadelphia Police Dept., and the F.B.I. Special Agent Sean Brenman show[e]d-up at the 7/11 store.
> (4) When the Agents finally appeared Petitioner informed them "first of all, whatever is going on I don't have anything to do with it, other than I want to help stop it." The Agents asked Petitioner what was going on? Petitioner informed them that a guy named Omar approached him and inquired about

7

the Fort Dix Military base and maps related to the base. And he, Omar, spoke something to the effect of wanting the Americans to pay for what they have been doing to Muslims.

(5) Petitioner informed the agents that, as soon as, he heard the statements from Omar his emotional alarms went off (in his head), and he could barely contain himself; thus, he's contacted them, and repeatedly reminded them that he wanted to help them in the matter.

(6) Then Petitioner tried to give the agents a portion of recorded conversation between Omar and himself that he was able to record and preserve on his Cell Phone in order to show the agents it's the "real deal". Petitioner played the small clip for the agents about four times, but the Agent Rycek suddenly appeared/seemed very angry, turning very red in the face – as if he was surprised or not expecting the Petitioner would have recorded the exchange with Omar. There also appeared to be some conflicting/contradictory emotions where the other Agent Sean Brenman appeared more intrigued and amicable to the idea of underlying record, where he also sought to hear the record over again.

(7) However, when Agent Brenman was done with listening to the recording, instead of taking it with them as something to their investigation, he simply instructed Petitioner not to loose [sic] it. Then the agents inquired as to who else was involved in the situation? And Petitioner informed that another guy named Muhammad. Petitioner did not know Muhammad's last name, nor where he actually lived, so he simply offered the agents his phone number. And volunteered that he believed the agents should be able to get whatever additional information they needed about the maps from Muhammad. Furthermore, that Muhammad frequented Petitioner's restaurant across from the Military Air Base.

(8) In a strange turn of events, when Petitioner offered Muhammad's number to Agent Rycek, he again produced strange contradictory energy and actions via his facial expressions and overall body language – suggesting he didn't want to take the info. from Pet[itioner]. In fact, the agent suddenly exhaled, "no no, no, we don't need that right now"!

> And again there was this awkward silence between the agents and Petitioner. The agents behavior was scaring Petitioner, [p]articularly where the two agents kept exchanging conflicting looks with each other. And just as Petitioner was about to ask "what's going on here"? Agent Brenman interjected and said: "I'll take that number", and Petitioner immediately gave it to him. The agent wrote the number of one who's now become Petitioner's convicted coconspirator Muhammad Shenewer [sic]. Ironically, none of the fore going information has been properly preserved as what is legally known as 302 material, or agents personal notes. (9) Quite the contrary, the foregoing facts was obfuscated, misrepresented and advanced before the trial court by the prosecution as part of their case-in-chief in the limited context case as if Petitioner has made up a bunch of lies, e.g., about the maps, or that Petitioner told them he did not know any one was involved in underlying crimes.

(Dkt. No. 27 at p. 44-45)

The government argues in its response that this Court can deny Claim IV because Mr. Tatar has failed to establish either prong of *Strickland*. In support of its arguments, the government includes an affidavit from Mr. Sparaco, Mr. Tatar's trial counsel. Mr. Sparaco's affidavit paints quite a different picture with respect to his interactions with Mr. Tatar and with respect to the advice and counsel he gave him. That type of evidence is important to determine whether Mr. Tatar has satisfied the first prong of *Strickland* – whether Mr. Sparaco's counsel fell below an objective standard of reasonableness. However, this Court will decline to engage in an analysis on the first prong of *Strickland* because Claim IV can and will be decided on the merits at this time on the second prong of *Strickland* – whether petitioner has made the requisite showing of prejudice to warrant granting relief.

As Mr. Tatar's amended § 2255 motion makes clear, he wanted to testify so that he could attempt to establish the affirmative defense of his withdrawal from the conspiracy. As the United States Supreme Court has explained with respect to the withdrawal defense:

> Far from contradicting an element of the offense, withdrawal presupposes that the defendant

committed the offense. Withdrawal achieves more modest ends than exoneration. Since conspiracy is a continuing offense, *United States v. Kissel*, 218 U.S. 601, 610, 31 S. Ct. 124, 54 L. Ed. 1168 (1910), a defendant who has joined a conspiracy continues to violate the law "through every moment of [the conspiracy's] existence," *Hyde v. United States*, 225 U.S. 347, 369, 32 S. Ct. 793, 56 L. Ed. 1114 (1912), and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot, *Pinkerton v. United States*, 328 U.S. 640, 646, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). Withdrawal terminates the defendant's liability for postwithdrawal acts of his co-conspirators, but he remains guilty of conspiracy.
Withdrawal also starts the clock running on the time within which the defendant may be prosecuted, and provides a complete defense when the withdrawal occurs beyond the applicable statute-of-limitations period. A complete defense, however, is not necessarily one that establishes the defendant's innocence. For example, we have held that although self-defense may entirely excuse or justify aggravated murder, "the elements of aggravated murder and self-defense [do not] overlap in the sense that evidence to prove the latter will often tend to negate the former." Martin, *supra*, at 234, 107 S. Ct. 1098; see *Leland v. Oregon*, 343 U.S. 790, 794–796, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952) (same for insanity defense). Likewise, although the statute of limitations may inhibit prosecution, it does not render the underlying conduct noncriminal. Commission of the crime *within the statute-of-limitations period* is not an element of the conspiracy offense. *See United States v. Cook*, 17 Wall. 168, 180, 21 L. Ed. 538 (1872). The Government need not allege the time of the offense in the indictment, *id.*, at 179–180, and it is up to the defendant to raise the limitations defense, *Biddinger v. Commissioner of Police of City of New York*, 245 U.S. 128, 135, 38 S. Ct. 41, 62 L. Ed. 193 (1917). A statute-of-limitations defense does not call the criminality of the defendant's conduct into question, but rather reflects a policy judgment by the legislature that the lapse of time may render criminal acts ill suited for prosecution. *See, e.g.,*

> *Toussie v. United States*, 397 U.S. 112, 114–115, 90 S. Ct. 858, 25 L. Ed. 2d 156 (1970). Thus, although union of withdrawal with a statute-of-limitations defense can free the defendant of criminal liability, it does not place upon the prosecution a constitutional responsibility to prove that he did not withdraw. As with other affirmative defenses, the burden is on him.

*Smith v. United States*, 133 S. Ct. 714, 719-20 (2013).

As the United States Supreme Court in *Smith* makes clear, a withdrawal defense would have presupposed that Mr. Tatar committed the offense such that even upon a withdrawal, Mr. Tatar still would have remained guilty of the conspiracy. *See* 133 S. Ct. at 721 ("His individual change of heart (assuming it occurred) could not put the conspiracy genie back in the bottle"). Instead, what Mr. Tatar's proposed withdrawal defense had the potential to do is start the running of the statute of limitations on the conspiracy charge. However, there is no dispute that the May 7, 2007 initial indictment against Mr. Tatar was brought within the relevant statute of limitations. *See* 18 U.S.C. § 3282 ("Except as otherwise provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."). Thus, Mr. Tatar's proposed withdrawal defense would not have made the government's indictment against him untimely. Accordingly, he has failed to show to a reasonable probability that the outcome of his trial would have been different because his withdrawal defense, even if, assuming *arguendo*, Mr. Tatar did in fact withdraw from the conspiracy, would not have altered the fact that he was guilty of conspiracy in the first place. [FN 3]

> [FN 3] This Court need not analyze respondent's alternative theory that Mr. Tatar failed to show that he actually withdrew from the conspiracy because his purported withdrawal would not have changed the outcome of the proceedings as Mr. Tatar was still charged with conspiracy within the applicable statute of limitations.

A brief interlude is warranted differentiating Mr. Tatar's case from the Duka brothers § 2255 motions where this Court recently conducted an evidentiary hearing on similar ineffective assistance of counsel claims regarding a failure to testify. The Duka brothers

> claim in their § 2255 motions that their decision not to testify was the result of attorney coercion. The Duka brothers all claim that they did not voluntarily waive their right to testify at trial because their decision was the product of attorney coercion when each of their attorneys told them that they were unprepared to put them on the stand despite each brothers' stated intent of wanting to testify. *See Duka v. United States*, Nos. 13-3664, 13-3665, 13-3666, 2015 WL 5768786, at *4-5 (D.N.J. Sept. 30, 2015). In an Opinion dated September 30, 2015, this Court stated that it would conduct an evidentiary hearing on the Duka brothers claims of ineffective assistance of counsel when they were denied the right to testify at trial. *See id*. at *6. Indeed, on January 6, 2016, this Court conducted an evidentiary hearing on the Duka brothers' failure to testify ineffective assistance of counsel claims. That hearing was limited to whether the attorney's conduct fell below an objective standard of reasonableness.
>
> Mr. Tatar's amended § 2255 motion is clear that the reason he sought to testify was to pursue a withdrawal defense. Comparatively, the Duka brothers' assert a complete defense in their brief that they wanted to testify to show that they never entered into a conspiracy in the first place. While the Duka brothers offer a complete defense, Mr. Tatar's withdrawal defense is not a complete defense, but rather, only starts the running of the statute of limitations. Assuming *arguendo* that Mr. Tatar affirmatively withdrew from the conspiracy, the only impact of that defense would have been whether the conspiracy charge against him was timely. However, as previously stated, the conspiracy charge was timely. Thus, Mr. Tatar's withdrawal defense, which is the stated *reason* why Mr. Tatar says he wanted to testify, would not have changed the outcome of the proceedings to a reasonable probability because the charge was timely. Accordingly, this Court is clearly able to decide Mr. Tatar's Claim IV solely on the prejudice prong of the *Strickland*. Accordingly, an evidentiary hearing is not warranted on this Claim and Mr. Tatar is not entitled to relief on Claim IV as well.

*Tatar v. United States*, No. 13-3317, 2016 WL 589671, at *9–13 (D.N.J. Feb. 11, 2016)

(footnote omitted).

As previously noted, this Court denied all of Mr. Tatar's claims (including Claim IV) and denied a certificate of appealability on all of his claims. Thereafter, Mr. Tatar filed a notice of appeal. He also sought a certificate of appealability with the Third Circuit, but only on Claim IV.

(*See* C.A. No. 16-1421, Mot. Certificate Appealability filed March 14, 2016) Mr. Tatar stated in that motion for a certificate of appealability with the Third Circuit that this Court missed the main issue with respect to Claim IV. Indeed, Mr. Tatar stated that had he taken the stand in his own defense, the outcome of the trial would have been different. (*See id.* at p.4-5) On May 24, 2016, the Third Circuit denied a certificate of appealability stating that Mr. Tatar had failed to provide factual support to warrant an evidentiary hearing on Claim IV. (*See* Dkt. No. 48)

Thereafter, on January 17, 2017, and again on January 27, 2017, Mr. Tatar filed identical motions for reconsideration from this Court's February 11, 2016 Opinion and Order. Mr. Tatar states that he is bringing his motion for reconsideration under Federal Rules of Civil Procedure 59(e), 60(b)(6) and Local Rule 7.1(i). He states his basis for reconsideration as follows:

> In issue "Number Four" Mr. Tatar, through assistance of a fellow inmate law clerk, had included a "withdraw defense" that was construed heavily by the District Court rather than Mr. Tatar's main argument of being denied a fundamental constitutional right to testify on his own behalf at trial at the deterrence of counsel. It was testimony that would have otherwise given the jury detailed information about his involvement, including a defense of entrapment by the investigating government agent who insisted Mr. Tatar engages with others that later led to him being indicted for conspiracy.

(Dkt. No 49 at p.2) Mr. Tatar claims that his testimony will establish his factual innocence of having conspired with others. (*See id.*) More specifically, he asserts that his testimony would prove and establish that: (1) counsel denied him a basic right to testify at trial; (2) new evidence that will now refute the Government's "Fort Dix 5" allegations; (3) evidence that will prove entrapment; (4) evidence that will establish his factual innocence. (*See id*. at p.3)

### III. LEGAL STANDARDS

Motions for reconsideration are filed pursuant to Federal Rule of Civil Procedure 59(e) and are governed by Local Civil Rule 7.1(i) which allows a party to seek reconsideration by the

Court in matters in which the party believes the judge has "overlooked." *See Carney v. Pennsauken Twp. Police Dep't*, No. 11–7366, 2013 WL 4501454, at *1 (D.N.J. Aug. 21, 2013) (citations omitted). "The standard for reargument is high and reconsideration is to be granted only sparingly." *Yarrell v. Bartkowski*, No. 10–5337, 2012 WL 1600316, at *3 (D.N.J. May 7, 2012) (citing *United States v. Jones*, 158 F.R.D. 309, 314 (D.N.J. 1994)). To be successful on a motion for reconsideration, a petitioner has the burden to demonstrate: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [issued its order]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citation omitted); *see also Berry v. Jacobs IMC, LLC*, 99 Fed.Appx. 405, 410 (3d Cir. 2004). Additionally, Rule 59(e) requires that it be filed within twenty-eight days after the entry of judgment. *See* Fed. R. Civ. P. 59(e).

> With respect to Rule 60(b)(6), a court:
>
>> may relieve a party from a final judgment for any reason that justifies relief. The standard for granting a Rule 60(b)(6) motion is a high one. The movant must show "extraordinary circumstances" to justify reopening a final judgment. *Gonzalez [v. Crosby]*, 545 U.S. [524,] 536 125 S.Ct. 2641 [(2005)]
>>
>>> [E]xtraordinary circumstances involve[ ] a showing that[,] without relief from the judgment, "an 'extreme' and 'unexpected' hardship will result." This "hardship" requirement may sometimes be satisfied when the judgment "precluded an adjudication on the merits." But extraordinary circumstances rarely exist when a party seeks relief from a judgment that resulted from the party's deliberate choices.

*Michael v. Wetzel*, 570 F. App'x 176, 180 (3d Cir. 2014) (quoting *Budget Blinds, Inc. v. White*, 536 F.3d 244, 255 (3d Cir. 2008)). However, a petitioner's claim that a court misconstrued

14

arguments in a habeas petition does not constitute extraordinary circumstances warranting relief under 60(b)(6). *See Parks v. Jordan*, No. 16-3117, 2016 WL 6839148, at *1 (3d Cir. Nov. 21, 2016).

## IV.    DISCUSSION

At the outset, Mr. Tatar's motion for reconsideration pursuant to Federal Rule of Civil Procedure 59(e) is untimely. As indicated above, this Court denied Mr. Tatar's amended § 2255 motion in February, 2016. Mr. Tatar then had twenty-eight days to file his motion for reconsideration. *See* FED. R. CIV. P. 59(e). However, he did not file his motions for reconsideration until almost one year later, in January, 2017. Therefore, Mr. Tatar is not entitled to reconsideration under Rule 59(e) because such motions are untimely. *See Smart v. Aramark, Inc.*, 618 F. App'x 728, 730 (3d Cir. 2015) (district court acted within its discretion in denying motion for reconsideration filed more than twenty-eight days after entry of the judgment from the district court). Mr. Tatar's motion for reconsideration is also untimely under Local Civil Rule 7.1(i), which requires that it be filed within fourteen days after the entry of judgment.

Accordingly, that leaves Federal Rule of Civil Procedure 60(b)(6) as Mr. Tatar's only potential remaining avenue for relief. It appears as if Mr. Tatar is asserting that this Court misconstrued the totality of his arguments in Claim IV. However, this is insufficient to warrant granting Mr. Tatar relief under Rule 60(b)(6). It does not constitute an extraordinary circumstance warranting relief under Rule 60(b)(6) as it is properly a matter for appeal. *See Parks*, 2016 WL 6839148, at *1. Indeed, it is also worth noting that Mr. Tatar raised this matter on his appeal to the Third Circuit in his application for a certificate of appealability before that Court. However, as indicated above, the Third Circuit denied granting Mr. Tatar a certificate of appealability on this issue.

It is possible that one could construe Mr. Tatar's motions as attempting to raise a new claim for habeas relief that was not raised in his previous amended § 2255 motion that this Court denied. However, as the Third Circuit has explained:

> in those instances in which the factual predicate of a petitioner's Rule 60(b) motion attacks the manner in which the earlier habeas judgment was procured and not the underlying conviction, the Rule 60(b) motion may be adjudicated on the merits. However, when the Rule 60(b) motion seeks to collaterally attack the petitioner's underlying conviction, the motion should be treated as a successive habeas petition.

*See Pridgen v. Shannon*, 380 F.3d 721, 727 (3d Cir. 2004). It does not appear that Mr. Tatar has received any authorization from the Third Circuit to file a second or successive § 2255 motion. Thus, to the extent that Mr. Tatar's motions for reconsideration do not challenge the manner in which this Court denied his amended § 2255 motion, but instead challenges his underlying federal judgment of conviction, it may not be a "true" Rule 60(b) motion, but rather, Mr. Tatar's attempt to bring another § 2255 motion. As Mr. Tatar lacks authorization to do so form the Third Circuit, such a request for relief is not proper before this Court at this time. Therefore, Mr. Tatar's motions for reconsideration will be denied.

## V.     CERTIFICATE OF APPEALABILITY

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003). To the extent one may be necessary, this Court declines to grant Mr. Tatar a certificate of appealability.

## VI. CONCLUSION

For the foregoing reasons, Mr. Tatar's motions for reconsideration will be denied. A certificate of appealability shall not issue. An appropriate order will be entered.


DATED:  March 10, 2017                                             s/Robert B. Kugler
                                                                                       ROBERT B. KUGLER
                                                                                       United States District Judge